IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| HENRY FULLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 5:10-CV-430 (MTT) |
| ) | |
| WAL-MART STORES, INC. ) | |
| ) | |
| Defendant. ) | |
| ) | |

**ORDER**

This matter is before the Court on Defendant Wal-Mart Stores, Inc.'s Motion for Summary Judgment. (Doc. 21). For the following reasons, the Motion is **GRANTED**.

**I.   FACTUAL BACKGROUND[1]**

This is an action for disparate treatment and retaliation on the basis of race by Plaintiff Henry Fuller pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. While the Plaintiff was an Assistant Manager of Store 930 in Montgomery, Alabama, he applied to become a Co-Manager of Store 1153 in Macon, Georgia.[2] The Plaintiff was interviewed by Market Operations Manager David James "Jimmy" Clark, a white male, Market Human Resources Manager Lisa Atchison, a black female, and Store Manager John Futch, a white male. On November 8, 2008, the

---

[1] The Defendant filed a Motion to Strike the Plaintiff's Affidavit because it contained facts not disclosed in his deposition testimony. (Doc. 28). However, the only material fact allegedly added by the Plaintiff's affidavit is Interim Store Manager Janice Sharp's knowledge of the Plaintiff's protected activity. As stated below, Sharp testified that she knew of the Plaintiff's protected activity. The Motion to Strike is **DENIED**.

[2] The relevant Wal-Mart hierarchy is Regional General Manager → Market Manager → Store Manager → Co-Manager → Assistant Manager. Store 1153 had one Store Manager, two Co-Managers, and several Assistant Managers.

Plaintiff was selected for the position at Store 1153.  The Plaintiff was the only Co-Manager at that time.

On January 7, 2009, the Plaintiff responded to a call for a manager to go to the pharmacy because a customer was angry she had received the wrong prescription.  Although Futch was over the entire store, including the pharmacy, the pharmacy practically functioned as an independent entity.  The Plaintiff gave the customer a refund, and a female pharmacist did not like how the Plaintiff intervened in one of their matters.  The pharmacist invited the Plaintiff to talk in private in what turned out to be the pharmacy bathroom.  The Plaintiff went inside even though he knew it was a bathroom, and later acknowledged that "as a member of management, [he] should have known not to go in that bathroom."  (Doc. 24-2, Deposition of Henry Fuller, at 178).  The pharmacist and the Plaintiff engaged in a heated discussion, which concluded when the pharmacist opened the bathroom door and used some degree of force to get the Plaintiff out the bathroom.

A "Red Book" investigation into the matter was conducted shortly thereafter.  According to the Plaintiff, Janice Sharp, a white woman who was the Market Grocery Manager, collected statements.  (Doc. 24-2, Deposition of Henry Fuller, at 224).  After the Red Book investigation concluded on February 15, 2009, Atchison, according to the Plaintiff, instructed Futch to issue "Decision-Making Day coaching" to the Plaintiff.  (Doc. 24-2, Deposition of Henry Fuller, at 273-74, 278).  The Defendant has four Coaching for Improvement levels based on the severity of the infraction: verbal coaching, written

coaching, Decision-Making Day coaching, and termination.[3]  (Doc. 24-30).  An employee may only receive one Decision-Making Day coaching within a 12-month period; a subsequent performance or behavioral issue is subject to immediate termination.  (Doc. 24-30, at 3).  The Plaintiff, believing level-three coaching was too severe, complained of racial discrimination by Futch to Atchison, the woman who instructed Futch to issue Decision-Making Day coaching, and Clark.  The Decision-Making Day decision was not overturned.

In April 2009, Donna Bostick, a white female, was hired as the second Co-Manager at Store 1153.  That month, Assistant Manager Sylvia Ann Ross, a black female, was terminated for insubordination by Futch at Atchison's instruction because Ross allegedly recorded a conversation between her and Futch.  (Doc. 24-5, Deposition of Peggy Blanton, at 23).  Ross was not given much explanation about why she was terminated and believed race was a factor in that decision, so Atchison, the woman who recommended Ross' termination, investigated the matter.  Ross was not pleased with the outcome of the "investigation," and the Regional General Manager asked Peggy Blanton, a black female who was the human resources manager in another market, to conduct an independent investigation.  Ross provided a list of employees she thought would have relevant knowledge to Blanton, but she did not name the Plaintiff.

---

[3] The Coaching for Improvement policy states, in part:

Coaching for Improvement is designed to be progressive.  Apply Coaching for Improvement in a fair, timely, and consistent manner.  *Always start at the appropriate Coaching Level* depending on the classification of behavior to be addressed.  More serious levels of coaching are used at appropriate intervals until either the Associates' conduct or performance reaches the desired improvement or all coaching levels have been exhausted.  However, there will be some situations where use of the Coaching process is not warranted and instead, the Associates' employment is automatically terminated.  (See Gross Misconduct section below.)

(Doc. 24-30, at 1) (emphasis added).

According to Blanton, the Plaintiff did not want to provide a written statement because he did not want his name mentioned. (Doc. 24-5, Deposition of Peggy Blanton, at 26). However he was involved, the Plaintiff does not recall "invok[ing] the harassment policy or discrimination policy on [Ross'] behalf after her termination." (Doc. 24-2, Deposition of Henry Fuller, at 253).

After the Red Book investigation concluded, it was determined that there was insufficient evidence to support the decision to terminate Ross, and she was reinstated on August 18, 2009, with back pay, given next-level coaching, and transferred to another store. Futch was given next-level coaching "based on poor business judgment," but because he was already on Decision-Making Day coaching, he was terminated on August 7, 2009. (Doc. 24-5, Deposition of Peggy Blanton, at 38). Sharp, the Market Grocery Manager, became the Interim Store Manager shortly thereafter.

After Sharp became the Interim Store Manager, the Plaintiff angrily entered her office because he was concerned that Ross' investigation was going to "backfire" on him. (Doc. 24-6, Deposition of Janice Sharp, at 40-41). When asked if she knew that the Plaintiff was involved in Ross' investigation, Sharp answered, "No, sir. I was unaware --- until he mentioned it, I was unaware he had anything to do, period, with that." (Doc. 24-6, Deposition of Janice Sharp, at 41).

On August 13, 2009, the Plaintiff, Bostick, and a few Assistant Managers decided to throw a birthday party for Assistant Manager Antonio Ingram. Bostick offered to pay half the cost of a gift from her personal funds, but the Plaintiff said "he would take care of it." (Doc. 24-3, Deposition of Donna Bostick, at 23). Bostick was under the impression the Plaintiff would pay for the gift with his personal funds. *Id.* However,

without prior approval, the Plaintiff purported to use the Associate Relations Account to purchase a watch for Ingram that cost $20.67 ($19.50 before taxes). "The Associate Relations Account (#972) is used to charge expenses for recognizing and appreciating Associates for *exceptional accomplishments*." (Doc. 24-29) (emphasis added). "Charges over $20 per month must be approved by the Market Manager." *Id*. Suggested uses for the Associate Relations Account include a "pizza party after exceeding budget or initiative goals for a quarter" and a "plaque for the Associate of the Year." *Id*.

An associate in the accounting department heard about the birthday gift and complained to Sharp, who was not at the store on the day of the birthday celebration. The Plaintiff told Sharp that throwing events to boost store morale was a normal practice while Futch was the Store Manager. Sharp did not believe throwing a birthday party for an Assistant Manager boosted employee morale, and she began a Red Book investigation.

On September 24, 2009, Sharp, along with two black Store Managers from other locations, communicated to the Plaintiff that he would receive next-level coaching, or termination, for violating the Associate Relations Account policy. The Plaintiff's exit interview says "Henry is being terminated for misconduct with coachings due to he purchased a $20 gift for an Assistant Manager and [illegible] by Associate relations and he had an active Decision Day and this was next level of coaching termination." (Doc. 24-22). The Plaintiff complained about the decision to Atchison and Blanton, but the decision to terminate him was not overturned.[4]

---

[4] In the end, the Plaintiff lost his job over a watch that Ingram did not even like. Because the Plaintiff had not paid for the watch, Ingram could only exchange it.

The Plaintiff brought this action on November 8, 2010. The Plaintiff argues his termination was discriminatory because he should not have been given Decision-Making Day coaching as a result of the pharmacy bathroom incident. The Plaintiff's main argument is that the watch cost only $19.50 before taxes and it was unreasonable to terminate him for spending 67 cents more than the Associate Relations Account policy allows. Thus, the Plaintiff focused on the amount spent as the basis for his termination. The Defendant followed the Plaintiff down this path, and claimed Sharp had reason to terminate the Plaintiff because he violated the Associate Relations Account policy by providing a $20.67 watch to Ingram.

However, this argument completely misses the mark. The Plaintiff's exit interview does not mention that the Plaintiff spent *more* than $20. Rather, it states "he purchased a $20 gift for an Assistant Manager." In her deposition, Sharp clearly and consistently testified that the Plaintiff was terminated for providing a gift to an individual without permission:

> Q: Does the [Associate Relations Account] policy specifically exclude the use of the associate relations account for celebratory gifts for associates?
>
> A: Yes, sir. It's only for -- you're not allowed to give gifts to anyone. That would be considered like personal.
>
> Q: And to your – I'm sorry.
>
> A: I would say that would be a violation, because that's a personal use. An example would be -- I'm not even allowed -- if I decide to give my management team a gift, then I have to pay for it personally. But I'm not allowed to take it out -- in my 27-year tenure with Walmart, never -- and if you violate that policy -- I mean, it's like – I really don't know the appropriate word, but you're -- it's not for your personal gains.
> …
>
> Q: Okay. The question is if Mr. Fuller was using his personal money to buy associate gifts for their birthdays, and Mr. Futch found out about that

> and directed him to use the associate relations account to buy that gift, the under $20 gift, would that have been a violation, then, if he had been directed by Mr. Futch to use the associate relations account?
>
> A: Yes, it would have been.
>
> Q: And why is that?
>
> A: Because we're never to use associate relations -- I am not allowed to use associate relations unless I get it approved from my market manager on an individual basis.  And that's not -- that's a violation of policy.
> …
>
> Q: Did you cite Mr. Fuller for the fact that the watch cost over $20?
>
> A: No, sir.  If it had cost five dollars, it would still have not been correct.
>
> Q: So according to your analysis of Mr. Fuller's action, the fact that the watch cost 67 cents over $20 was of no significance?
>
> A: No, sir.  If he'd have bought something for five dollars, it would have still -- a gift is a gift.  It don't matter -- the monetary amount has nothing to do with it.
>
> Q: So it's your position that Mr. Fuller violated the associate relations policy because he purchased a gift -- correction -- provided a gift to another associate in the store?
>
> A: Yes, sir, because it was on an individual basis.

(Doc. 24-6, Deposition of Janice Sharp, at 49, 75, 110-11).  Although not articulated as clearly as Sharp, the Defendant's briefs do address her reason for terminating the Plaintiff.  The Plaintiff attempts to rebut this reason by claiming that Futch allowed individual gifts to be purchased when he was Store Manager and the Associate Relations Account policy applies to the "exceptional accomplishments" of individuals.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d at 1224.  The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor."  *Id.*

### B.  Title VII Disparate Treatment

The Plaintiff, like most plaintiffs, relies on the *McDonnell Douglas* framework to establish his case through circumstantial evidence.  "A prima facie case of discriminatory discharge requires a plaintiff to show that he was a member of a protected class; he was qualified for the job; he was terminated despite his qualifications; and after his termination the position remained open and the employer continued to seek applicants of similar qualifications."  *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964 (11th Cir. 1997).  Some courts state that the fourth element requires the plaintiff to show that "he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his

protected class." *Maynard v. Board of Regents of Div. of Univ. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). If the plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason. *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002). "Should the employer meet its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination."[5] *Id.* at 1272-73. "Title VII does

---

[5] There is some confusion regarding a plaintiff's burden to prove pretext. Citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502 (1993), some cases suggest that a plaintiff responding to an employer's motion for summary judgment must prove that the employer's legitimate, discriminatory reason is false *and* that discrimination was the real reason for the employer's action. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 587 (6th Cir. 2009); *Maxfield v. Cintas Corp. No. 2,* 427 F.3d 544, 550-51 (8th Cir. 2005). However, the Supreme Court in *St. Mary's* did not address a plaintiff's burden at the summary judgment stage. Rather, the Court addressed whether an employee is entitled to judgment as a matter of law when the factfinder has concluded that the employer's nondiscriminatory reason is false, but nevertheless found that the employer did not intentionally discriminate against the plaintiff. Moreover, as noted by Judge Wilson in his concurring opinion in *Convoy v. Abraham Chevrolet-Tampa, Inc.,* 375 F.3d 1228, 1236 (11th Cir. 2004), the Supreme Court in *St. Mary's* "flatly rejected the so-called 'pretext-plus' approach to discrimination analysis, which had required the plaintiff not only to demonstrate that the employer's asserted reasons were pretextual, but also to introduce additional evidence of discrimination." In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000), the Supreme Court disposed of any lingering viability of pretext-plus analysis. While it is true the plaintiff must ultimately prove intentional discrimination, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147 (emphasis in original). In a concurring opinion, Justice Ginsburg, in a summary of the majority's holding, wrote that a plaintiff "*may* survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a 'prima facie case,' …; and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false." *Id.* at 154 (emphasis in original); *see also Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012) (citing *Reeves* for the proposition that a "convincing mosaic of circumstantial evidence" "may consist only of the plaintiff's prima facie case and of the evidence rebutting the employer's proffered reasons"). Clearly, at the summary judgment stage, the plaintiff, in rebutting the employer's proffered legitimate, nondiscriminatory reason, does not shoulder the burden of producing evidence both of falsity and that the real reason was discrimination. Indeed, the *McDonnell Douglas* test is all about proving intentional discrimination by circumstantial evidence; if the employee had direct evidence that the real reason for the adverse employment action was discrimination, the employee would have no need to resort to the *McDonnell Douglas* test.

*not require the employer's needs and expectations to be objectively reasonable*; it simply prohibits the employer from discriminating on the basis of membership in a protected class. We do not sit as a super-personnel department, and it is not our role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant – as long as those decisions were not made with a discriminatory motive. *That is true no matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers.*" *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010) (internal quotation marks and citations omitted) (emphasis added). Because the pretext inquiry centers on the employer's beliefs, the question is whether the employer believed the employee was guilty of misconduct. *Id.* at 1266.

Although the Plaintiff points to his Decision-Making Day coaching for the pharmacy bathroom incident as evidence of discrimination, lengthy discussion of this incident is not necessary. The Plaintiff concedes that the decision to issue Decision-Making Day coaching to him was made by Atchinson, a black female. Further, the Coaching for Improvement process *clearly* provides discretion with regard to the appropriate coaching level, and the Plaintiff even testified to this fact. (Doc. 24-2, Deposition of Henry Fuller, at 66-67). Finally, because Sharp testified that she would have terminated the Plaintiff even if he had not been on Decision-Making Day coaching, there is no way to know what effect it had on his termination. (Doc. 24-6, Deposition of Janice Sharp, at 93-94).

The Defendant initially did not challenge whether the Plaintiff had established a prima facie case of discrimination with regard to his termination. Presumably, the

Defendant was under the impression that the Plaintiff had established a prima facie case because the position remained open and it continued to seek applicants of similar qualifications. However, in his Response, the Plaintiff used the fourth element that requires him to be replaced by someone outside the protected class, and claimed he was replaced by Bostick. The Defendant jumped all over this in its Reply and Motion to Strike because the Plaintiff and Bostick worked together as Co-Managers, and thus she could not have replaced him. The Court agrees with the Defendant; while it may be argued that Bostick *filled* the Plaintiff's vacant Co-Manager position, it is a stretch to say she *replaced* the Plaintiff. In any event, the Defendant does not contest that the Co-Manager position remained open and it accepted applications for the position. The Court will assume, as the Defendant initially did, that the Plaintiff has established a prima facie case of discrimination.

With regard to the legitimate, nondiscriminatory reason, the Defendant argues that the Plaintiff was terminated because he selected a gift for an individual employee without approval from a Market Manager. This unquestionably constitutes a legitimate, nondiscriminatory reason.[6]

With regard to pretext, the Plaintiff argues that Futch allowed gifts to be purchased for individual employees and the policy applies to the "exceptional

---

[6] The Defendant, allowing itself to be drawn into the Plaintiff's 67-cents argument, also argues that spending 67 cents more than the Associate Relations Account policy allows is a legitimate, nondiscriminatory reason for discharge. The Plaintiff contends this is an illegitimate, nondiscriminatory reason because it is unreasonable, but "[t]he reason must be legitimate or nondiscriminatory, which means only that it is not a motive that is illegal under Title VII.'" *Bakewell v. Stephen F. Austin State Univ.*, 975 F. Supp. 858, 885 (E.D. Tex. 1996) (quoting Rodney A. Smolla, FEDERAL CIVIL RIGHTS ACTS § 9.03[4] (3d ed.)). Thus, the Defendant's contention that the Plaintiff spent 67 cents more than the Associate Relations Account policy allows is a legitimate, nondiscriminatory reason. The Plaintiff does not rebut that reason.

accomplishments" of individuals. The first argument is irrelevant because Futch was no longer the Store Manager when the Plaintiff selected the watch.[7] The second argument is an extremely stretched interpretation of the Associate Relations Account policy because a birthday hardly constitutes an "exceptional accomplishment." Instead, the "exceptional accomplishment" requirement is intended to apply to items such as a plaque for the Associate of the Year.

Even if a birthday could constitute an "exceptional accomplishment," which the Court highly doubts, the determination whether the Plaintiff *actually* violated the Association Relations Account policy is not dispositive. As reiterated by the Eleventh Circuit in *Alvarez*, "[s]howing only that the employer's proffered reason is false does not necessarily entitle a plaintiff to get past summary judgment." 610 F.3d at 1264 (citing *Reeves v. Sanderson Prods., Inc.*, 530 U.S. 133, 148 (2000)). The question is whether Sharp, as decisionmaker for the Defendant, *believed* the Plaintiff violated the policy, even if she was mistaken. *Alvarez*, 610 F.3d at 1266. Thus, to survive summary judgment, the Plaintiff must show that Sharp did not honestly believe the reason. The Eleventh Circuit has consistently resolved "employer's belief" cases in favor of the employer on summary judgment. *Jarvis v. Siemens Medical Solutions USA, Inc.*, 460 Fed. Appx. 851 (11th Cir. 2012)[8]; *Hudson v. Blue Cross Blue Shield of Ala.*, 431 Fed. Appx. 868 (11th Cir. 2011); *Alvarez*, 610 F.3d 1253; *Thompson v. Carrier Corp.*, 358

---

[7] Also, it is worth noting that the Plaintiff cannot recall when he used the Associate Relations Account, how many times he used it, or what he used it for. (Doc. 24-2, Deposition of Henry Fuller, at 236, 334). In fact, the Plaintiff claims he paid for gifts out of pocket until Futch told him to use the Associate Relations Account. (Doc. 24-2, Deposition of Henry Fuller, at 229-30). Consistent with this fact, when the Plaintiff told Bostick that he was going to take care of the gift, she thought he was going to use personal funds.

[8] Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2.

Fed. Appx. 109 (11th Cir. 2009); *Lockett v. Choice Hotels Intern., Inc.*, 315 Fed. Appx. 862 (11th Cir. 2009); *Rioux v. City of Atlanta, Ga*, 520 F.3d 1269 (11th Cir. 2008); *Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997).

Here, the Plaintiff has presented no evidence that Sharp, who was the Market Grocery Manager before serving as Interim Store Manager, did not honestly believe the Plaintiff violated company policy.  While the Plaintiff may not see anything wrong with a manager selecting a birthday gift for an individual employee, Sharp had every reason to question that practice because it results in "shrinkage" to the store.  Her understanding of Wal-Mart policy was rooted in common sense.  The Plaintiff testified that over 300 employees worked at Store 1153.  (Doc. 24-2, Deposition of Henry Fuller, at 63).  Even if the Plaintiff selected a $4.00 birthday gift for every employee, Store 1153 would lose over $1000.00 in merchandise annually.  Further, Clark and Blanton, both Market Managers, corroborated Sharp's testimony that the Associate Relations Account policy was not used for individual gifts.  (Doc. 24-7, Deposition of Jimmy Clark, at 39); (Doc. 24-5, Deposition of Peggy Blanton, at 45).  The Plaintiff conceded that he "could have sought clarification regarding the use of the Associate Relations Account if he had any concerns."  (Doc. 22, Statement of Material Facts, at ¶ 71); (Doc. 25, Response to Statement of Material Facts, at ¶ 71).  He did not, and he lost his job because of it.

Accordingly, because the Plaintiff violated the Associate Relations Account policy by providing a gift to an individual without approval or Sharp honestly believed he violated the policy, summary judgment must be granted in favor of the Defendant.[9]

---

[9] The Plaintiff does not argue that he has otherwise presented circumstantial evidence sufficient to raise an inference of discrimination pursuant to *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Moreover, the Court finds he has not presented such circumstantial evidence for a jury to infer racial discrimination.

### C.     Title VII Retaliation

The *McDonnell Douglas* burden-shifting framework also applies in Title VII retaliation cases.  To establish a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse employment action.  *Brown v. Alabama Dept. of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).  With regard to the first element, the employee must "at the very least, communicate her belief that discrimination is occurring to the employer, and cannot rely on the employer to infer that discrimination has occurred."  *Demers v. Adams Homes of Northwest Fla., Inc.*, 321 Fed. Appx. 847, 852 (11th Cir. 2009) (internal quotation marks and citations omitted).  With regard to the third element, "the temporal relationship between the protected activity and the adverse employment action must be 'very close.'  Even a three-month interval between the protected expression and the employment action … is too long."  *Brown*, 597 F.3d at 1182 (internal quotation marks and citations omitted).

Here, only the Plaintiff's involvement with Ross' investigation falls within the "very close" window for retaliation.  The Parties dispute whether Sharp knew the Plaintiff was involved in Ross' investigation.  Although the degree of the Plaintiff's opposition is in question, Sharp knew he had something to do with Ross' investigation when he entered her office upset that his involvement may backfire on him.  The Plaintiff was terminated by Sharp the following month.  These facts are sufficient to satisfy the second and third elements of the Plaintiff's prima facie case of retaliation.  However, there is some question whether the Plaintiff has satisfied the first element because Ross' investigation

was not necessarily about Title VII discrimination and the Plaintiff did not recall invoking the discrimination policy on Ross' behalf.  Further, even if the Plaintiff could establish a prima facie case of retaliation, as stated above, the Plaintiff cannot rebut the Defendant's legitimate, nonretaliatory reason that he violated the Associate Relations Account policy or Sharp honestly believed he did.

Accordingly, because the Plaintiff cannot establish a prima facie case or rebut the Defendant's legitimate, nonretaliatory reason, summary judgment must be granted on the Plaintiff's retaliation claim.

### III.   CONCLUSION

For the foregoing reasons, the Motion is **GRANTED**.

SO ORDERED, this 6th day of August, 2012.

                                              S/ Marc T. Treadwell
                                              MARC T. TREADWELL, JUDGE
                                              UNITED STATES DISTRICT COURT